Phyllis Wilson HOFFMAN, Plaintiff,

and

Equal Employment Opportunity Commission, Plaintiff-Intervenor,

v.

UNITED TELECOMMUNICATIONS, INC., et al., Defendants.

Civ. No. 76–223–C2.

United States District Court, D. Kansas.

Dec. 8, 1983.

1464

Karen A. Plax, Plax & Cochet, Kansas City, Mo., David J. Waxse, Payne & Jones, Chtd., Olathe, Kan., for plaintiff.

Lamont White, Trial Atty., E.E.O.C., Ofc. of Gen. Counsel, Washington, D.C., Amanda Meers, Asst. U.S. Atty., D. Kan., Kansas City, Kan., for plaintiff-intervenor.

Karl F. Schmidt, Byron J. Beck, T. Nelson Mann, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., Edward Boddington, Boddington & Brown, Kansas City, Kan., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This employment discrimination action was filed pursuant to Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, in 1976 by plaintiff Phyllis Wilson Hoffman. The action named as defendants Ms. Hoffman's former employer, United Systems Services, Inc. [USSI], its holding company parent corporation, United Telecommunications, Inc. [UTI], and thirty-eight other subsidiaries of UTI which are located throughout the country. Plaintiff asserts not only her individual claim of employment discrimination against USSI on the basis of her sex, but also acts on behalf of "all females who are, were, or might be employed by the defendants in managerial and professional positions" in asserting potential class action claims against all thirty-eight defendants.

The summonses, complaints and attachments in this matter were served on UTI and USSI by serving Paul H. Henson, the Registered Agent for said corporations, on November 16, 1976. Service of process was also made upon Henson for the remaining thirty-eight defendants. On December 29, 1976, answers were filed on behalf of UTI and USSI which did not challenge jurisdiction, service of process nor venue. The remaining thirty-eight defendants, however, filed motions to dismiss raising various objections. For case in referring to the remaining thirty-eight defendants, the court has divided them into two groups. The first group contains twenty-three defendants, beginning with Carolina Telephone and Telegraph Company, and will be referred to as "the Carolina defendants." These defendants filed motions to quash service of process and to dismiss on the basis of improper service of process, lack of personal jurisdiction and improper venue. The remaining group of fifteen defendants, beginning with Capitol City Telephone Company, will be referred to as "the Capitol City defendants." Each of these defendants filed a motion to dismiss raising only improper service of process.

After nearly six years of discovery on the jurisdictional issues alone, defense counsel have submitted their proposed findings of fact and conclusions of law and memoranda in support of their motions to dismiss and to quash, and plaintiff's counsel have responded with their memoranda in opposition. Although Judge Earl E. O'Connor, in his Memorandum and Order of September 21, 1977, wherein discovery was limited solely to jurisdictional issues and not inclusive of the class action issues, requested that the parties submit short, concise memoranda of their positions on said motions to dismiss upon completion of discovery, counsel could not restrain themselves, and have deluged the court with several mammoth briefs each containing an average page length in excess of seventy-five pages. In addition, plaintiff submitted for the court's perusal and inspection three boxes of documents and exhibits consisting of approximately six hundred and fifty documents. Although the court has given due consideration to all exhibits, depositions, memoranda of law and proposed findings of fact and conclusions of law submitted by all parties, the court will not make an attempt to meet each finding individually. The court has, rather, attempted to pare down the mountain of information before it so that an orderly and brief discussion of the issues may ensue.

As was noted above, this is a Title VII action brought by plaintiff against her former employer, USSI, its parent company, UTI, and thirty-eight subsidiaries. Ms. Hoffman was employed by USSI in its Industrial Relations Department in Westwood, Kansas, from February 14, 1972, until May 9, 1975. In her complaint filed with this court on November 5, 1976, Ms. Hoffman alleged that USSI discriminated against her on the basis of her sex with respect to her initial job assignment, her training and advancement opportunities, her salary and responsibility levels, and her termination. Moreover, in her complaint she asserts class-wide sex discrimination claims against all defendants with respect to job classification and assignments, promotions, recruitment and hiring, transfers, compensation, job responsibilities, participation in management development programs, and exclusion from employment on the basis of characteristics generally attributable to women. She further states in her complaint: "[T]he class which plaintiff rep-

resents is composed of all females who are, were, or might be employed by the defendants in managerial or professional positions at its headquarters in Westwood, Kansas, and all offices of its subsidiaries and affiliates, and who have been, or continue to be, or might be adversely affected by the practices complained of herein."

After a general review of the circumstances of these proceedings, the Equal Employment Opportunity Commission [hereinafter EEOC] intervened in this action to promote the public policy of eliminating and preventing discriminatory employment practices based upon sex.

## PERSONAL JURISDICTION

Having generally reviewed the history of this case itself, the court is now prepared to turn to the substantive motions before it. First, the court will address the motions filed by the Carolina defendants in which they object to personal jurisdiction, service of process and venue. As to these three areas of objection, the court will address first the issue of personal jurisdiction.

■ Before the initial inquiry as to jurisdiction may be probed, the court must note that where the power of the federal court is invoked not on the grounds of diversity of citizenship, but because a federal right is claimed, i.e., on the ground that the matter in controversy arises under the constitution, laws or treaties of the United States, the limitations upon the courts of a state do not control a federal court sitting in that state. *Angel v. Bullington*, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947). *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

In Wright and Miller, *Federal Practice and Procedure:* Civil § 1075 (1969 Ed.), 1983 Supp., it is stated:

"The general practice in federal question cases has been that questions of whether a foreign corporation is amenable to process are determined in accordance with concepts of due process developed with reference to state long-arm statutes. Thus, the critical question presented is whether the corporation has

sufficient minimum contacts with the forum state to permit the exercise of jurisdiction over it...."

*Id.* at 143–44.

Accordingly, the court's inquiry will not begin with a search for whether the state has provided for bringing the foreign corporation into its courts via a long-arm statute, but rather will center solely on the question of whether the constitutional due process requirements of "minimum contacts" with the forum have been satisfied.

Originally courts recognized three traditional bases of personal jurisdiction: physical presence, consent and residence. The early cases which addressed questions of personal jurisdiction over non-resident individual defendants or over foreign corporations determined that finding jurisdiction according to one of these bases was essential to due process of law as contemplated in the Fifth and Fourteenth Amendments. These cases found due process to have been violated where a court rendered a personal judgment against a non-resident defendant merely by serving process upon him outside the forum or by publication. See *Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 24 L.Ed. 565 (1877). It was thought that a judgment would be enforceable only if the non-resident was somehow present within the territorial boundaries of the state in which the court was sitting. This rationale tended to equate jurisdiction with power to enforce a judgment.

In 1945, however, the United States Supreme Court, in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), addressed the question of jurisdiction over a foreign corporation, and in so doing undertook a clear break with the *Pennoyer* theory and substantially advanced a state's jurisdiction over foreign corporations. In *International Shoe*, and its progeny, the inquiry into the State's jurisdiction over a foreign corporation appropriately focused not on whether the corporation was "present" within the forum, but on whether there had been such contacts between the forum state and the foreign corporation as would make it "reason-

**1468**

able, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there." *Id.* 326 U.S. at 317, 66 S.Ct. at 158.

In *International Shoe*, the court stated a comprehensive new approach to the whole question of state judicial jurisdiction and rejected the jurisdictional requirement that a non-resident defendant be "present" within the forum before service of process on the non-resident and jurisdiction would be proper and in accordance with due process. The court, without overruling the older cases which had founded jurisdiction on presence or consent, set out a new test with now famous factors that weigh in the balance of interests and control the determination of whether the exercise of jurisdiction over a non-resident meets constitutional requirements. This test has become known as the "minimum contact" or "fundamental fairness" test.

As the court stated in *International Shoe, supra,* 326 U.S. at 316, 66 S.Ct. at 158:

> "Historically the jurisdiction of courts to render judgment *in personam* is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. *Pennoyer v. Neff*.... But now that the *capias ad respondendum* has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice....'" (Citations omitted.)

The relationship between the defendant and the forum must be such that it is "... reasonable ... to require the corporation to defend the particular suit which is brought there...." *Id.* at 317, 66 S.Ct. at 158.

Continuing, the court stated:

> "It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative.... Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations....
>
> "But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue...." (Citations omitted.)

*Id.* at 319, 66 S.Ct. at 159–160.

Hence, with the onset of *International Shoe*, the test for jurisdiction became one based on a qualitative analysis of several circumstances in each particular case as opposed to a quantitative analysis. The central concern of inquiry into personal jurisdiction focused upon the relationship among the defendant, the forum and the litigation.

In *Energy Reserves Group, Inc. v. Superior Oil Co.,* 460 F.Supp. 483 (D.Kan.1978), the rules for extending personal jurisdiction over non-resident defendants were further delineated. In that opinion, Judge Theis stated:

> "The existence of jurisdiction under *International Shoe* thus depends on a 'sufficient connection between the defendant and the forum State as to make it fair to require defense of the action in the fo-

rum.' See *Kulko v. Superior Court*, 436 U.S. 84, at 91, 98 S.Ct. 1690, at 1697, 56 L.Ed.2d 132 (1978). The requirement of overall fairness is as significant as the necessity that a defendant have at least a minimal tie or relationship to the forum. See 2 Moore, *Federal Practice*, ¶ 4.25[5] at 1171–73 (2d ed. 1977). Relevant due process considerations include the inconvenience of litigation in the forum, concerns relating to the fair and orderly administration of the laws, the 'quality and nature' of the defendant's contacts with the forum, and whether these contacts bear any relation to plaintiffs' claims. *International Shoe*, 326 U.S. at 317, 66 S.Ct. 154; see also Casad, *Long Arm and Convenient Forum*, 20 Kan.L. Rev. 1, 4–7 (1971) (hereinafter 'Casad, Long Arm'). It remains the duty of the court to weigh the facts of each case to determine whether the requisite 'affiliating circumstances' are present, so that it is both reasonable and fair to require the defendant to answer in the forum. *Kulko v. Superior Court, supra*, 436 U.S. at 91, 98 S.Ct. at 1697."

*Energy Reserves, supra*, 460 F.Supp. at 502.

■ Judge Theis continued, stating that jurisdiction over a non-resident party may not be acquired by a court where it is merely asserted that the court is the center of gravity of the controversy, rather there must be some act whereby the defendant purposefully avails itself of the privilege of conducting activities within the state before due process may be satisfied and jurisdiction may be constitutionally exercised over that non-resident. *Hanson v. Denckla*, 357 U.S. 235, 253–54, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958). These activities, however, need not be conducted personally by the non-resident defendant physically in the forum. *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). The due process requirement may be satisfied and jurisdiction thereby constitutionally exercised over the non-resident who has no physical contacts with the forum. *Travelers Health Assn. v. Virginia*, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950). More-over, jurisdiction may be based on a non-resident's activities in the forum even when they bear no relation to plaintiff's claim. *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952); *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

■ In considering jurisdictional questions, a two-step analysis is applied. First, it must be determined whether the defendants' contacts with the forum are sufficient to satisfy the minimum contacts test of *International Shoe*, and, second, the court must determine whether the defendants' conduct falls within the scope of service authorized by statute.

The initial task facing this court, therefore, is the determination of whether or not the Carolina defendants have sufficient minimum contacts with the forum state of Kansas such that the exercise of jurisdiction and the maintenance of the present lawsuit are fundamentally fair and do not offend the "traditional notions of fair play and substantial justice."

■ It must be noted that when the existence of personal jurisdiction is controverted, the burden of proof is on the plaintiff to demonstrate jurisdiction is present. The plaintiff, however, need only make out a *prima facie* case that the constitutional and statutory requirements for the assumption of personal jurisdiction are satisfied. *Ammon v. Kaplow*, 468 F.Supp. 1304, 1309 (D.Kan.1979); *Professional Investors Life Ins. Co., Inc. v. Roussel*, 445 F.Supp. 687, 691–92 (D.Kan.1978); *Thermal Insulation Systems, Inc. v. Ark-Seal Corp.*, 508 F.Supp. 434, 437 (D.Kan.1980).

Defendants argue that application of this *prima facie* standard is inconsistent both with prior positions of the plaintiff and prior rulings of the court. They argue that Judge O'Connor's Memorandum and Order of September 21, 1977, in which a motion by defendants for discovery regarding class action issues was overruled, and in which plaintiff's motion to stay all proceedings pending completion of discovery on the decision of the jurisdictional issues was

granted, requires this court to apply a more strict standard than a *prima facie* standard. This court does not so find. Although the Memorandum and Order of September 21, 1977, limited discovery to the jurisdictional rather than the class action issues, it did not vary the standard recognized and followed in this district for the determination of a personal jurisdiction issue when that issue is controverted. The court will, therefore, apply the *prima facie* standard in determining whether or not plaintiff has met her burden of establishing personal jurisdiction over the twenty-three Carolina defendants. In applying this standard, the court may consider affidavits and documentary evidence [*Ammon v. Kaplow, supra,* at 1309; *Perdue v. Gerry Black's British Auto Imports, Inc.,* No. 78–4201 (D.Kan., *unpublished,* 10/20/78)], and must give plaintiff the benefit of all factual doubt. *Ammon v. Kaplow, supra,* at 1309; *Heyen v. May,* No. 75–238–C6 (D.Kan., *unpublished,* 1/29/76).

▮ The "minimum contacts" test of *International Shoe* precludes mechanical application of facts and circumstances and requires instead the determination of reasonableness or fairness. In each case, the court must weigh the facts to determine whether or not the quality and nature of the defendant's activity is sufficient to require the defendant to conduct his defense in the forum state. *Kulko v. Superior Court, supra,* 436 U.S. at 92, 98 S.Ct. at 1696. In weighing these facts, the court must determine whether there is some act by which the defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thereby invoking the benefits and protections of its laws. *Hanson v. Denckla, supra,* 357 U.S. at 253, 78 S.Ct. at 1239. In addition, the court must consider the inconvenience to the parties and the interest of the State in providing a forum for the action. *Kulko v. Superior Court, supra,* 436 U.S. at 93, 98 S.Ct. at 1697; *J.E.M. Corp. v. McClellan,* 462 F.Supp. 1246, 1254 (D.Kan.1978).

As stated by Chief Justice Stone in *International Shoe, supra:*

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue...." (Citations omitted.)

*Id.* 326 U.S. at 319, 66 S.Ct. at 160.

In the well-reasoned *Energy Reserves* opinion, it was determined that formal separation of corporate identities did not create a constitutional barrier to exercising personal jurisdiction over a non-resident corporation whose affiliated corporation had a substantial nexus with the forum. Judge Theis found and concluded "that the constitutional analysis under *International Shoe* permits consideration of a non-resident's relationship with an affiliated corporation in the forum, notwithstanding their proper maintenance of separate corporate identities." *Energy Reserves, supra,* 460 F.Supp. at 490.

The argument of the defendants in *Energy Reserves* was that the plaintiff could only prevail on the jurisdictional question upon a showing that the corporate veil between Superior Oil Co. and Superior Overseas could be pierced and that the subsidiary corporation was the mere "alter ego" of the parent, thereby allowing the court to treat the two corporations as one and to consider the parent's relationship with the forum in order to establish jurisdiction over the non-resident subsidiary. The defendants relied on *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), as adopted and applied by Kansas in *Farha v. Signal Companies, Inc.,* 216 Kan. 471, 532 P.2d 1330, *modified* 217 Kan. 43, 535 P.2d 463 (1975). The *Energy Reserves* court found that the rule of *Cannon* was no longer viable in jurisdiction analysis.

Judge Theis found that the alter ego and minimum contacts tests bear little relation to each other. Although the factors which

indicate those circumstances under which a subsidiary corporation and its parent or owner may be treated as one for purposes of liability are significant in gleaning from the record whether the formal corporate separation has been maintained, these factors have little relation to those which bear upon the due process fairness question of requiring a defendant to answer in the forum. *Energy Reserves,* 460 F.Supp. at 506–07.

These "corporate factors," stated the court, reflect only one aspect of the quality and nature of one of the non-resident's ties with the forum, namely, its business relationship with an affiliated corporation in the forum. Relevant jurisdictional factors which the court concluded were excluded from or not reflected in alter ego analysis included: inconvenience of litigation in the forum, concerns for the fair and orderly administration of the laws, whether the claim asserted arises in the forum, the amount of revenue the non-resident derives from affiliated corporations in the forum, and how much direction it gives or receives from an affiliated corporation in the forum. "The constitutional propriety of the exercise of jurisdiction rests upon a balancing of the different considerations noted above." *Energy Reserves,* 460 F.Supp. at 507.

■ Thus, although a corporation's relationship with an affiliated corporation in the forum is relevant to the due process question, the fact of the existence of the relationship, however substantial or attenuated the relationship may be, is only ONE factor or minimum contact, tie or relation with the forum upon which a court may rely to determine whether jurisdiction over the non-resident may be constitutionally exercised.

■ Judge Theis found the nature of the intercorporate relationship, or the relationship between a subsidiary corporation and its parent or holding company, highly probative of the quality and nature of the non-resident's contact with the forum through an affiliated corporation. The activity or presence in the forum of a corporation that either owns or is owned by a non-resident corporation is in many, if not all cases, an affiliating circumstance of the non-resident with the forum. Judge Theis further determined that "the court *may consider the fact of the relationship and weigh its relative significance,* whether or not it is sufficient under principles of corporate law to support a finding of 'alter ego' or 'instrumentality' sufficient to pierce the corporate veil and impose liability on an affiliated corporation." *Energy Reserves,* 460 F.Supp. at 508. (Emphasis supplied.) He continued stating, "following the decision in *Shaffer,* corporate law analysis offers nothing that concludes or forecloses the constitutional analysis of the factors of foreign ties, convenience and judicial administration that control the reasonableness of requiring a litigant to answer in the forum." Hence, corporate law factors which may or may not be sufficient to reflect or support an alter ego theory sufficient to justify a disregard of the corporate entity may nevertheless reflect an aspect of the "quality and nature" of one of the non-resident's ties with the forum, namely its business relationship within an affiliated corporation in the forum. Thus, the non-resident corporation's tie to the forum as established through its relationship with an affiliated corporation physically present or transacting business in the forum is one factor upon which a court may rely to determine whether jurisdiction over the non-resident may be constitutionally exercised. In *Energy Reserves,* 460 F.Supp. at 507, it was stated:

"... Quite clearly, the ownership of an affiliated corporation within the forum is a 'contact, tie or relation' of that non-resident with the forum. Similarly, the presence in the forum of an affiliated corporation that directs or provides funds or benefits to a non-resident is a 'contact, tie or relation' of that non-resident with the forum. Either represents a 'commercial act' or relationship that 'connotes [an] intent to obtain [or an] expectancy of receiving a corresponding benefit in the State that would make fair the assertion of that State's judicial jurisdiction.' *Kulko, supra,* 436 U.S. at 101,

98 S.Ct. at 1701. Like the ownership of property in the state, the existence in a forum of an affiliated corporation with which the non-resident has some relationship implicates a flow of control and benefits to and from the forum as a consequence of that ownership. It is thus *one* indication of the non-resident's nexus with the forum and therefore has *some* weight in the overall evaluation of the fairness or reasonableness of the exercise of jurisdiction." (Citations omitted.) (Emphasis supplied.)

Hence, it must again be stated that, for jurisdictional purposes, *the fact of the existence of a relationship* between an affiliated corporation and a non-resident subsidiary corporation (however substantial or attenuated the relationship may be) is a minimum contact, tie or relation with the forum that may render possible the constitutional exercise of jurisdiction if the relevant factors, including both convenience and the orderly administration of the laws, balance in that direction. The mere existence of the relationship is one relevant factor. The nature of the relationship—the degree of the control or the identity—bears upon the weight to be given that one factor, but it does not foreclose reliance on this factor as a legitimate consideration in the due process analysis. *Energy Reserves*, 460 F.Supp. at 507.

The *Energy Reserves* opinion, in essence, divided the issue of whether or not minimum contacts, ties or relations with the forum exist into a search by the court for three different factors. First, the court must search for factors which establish whether or not any relationship exists between the affiliated corporate parties. Second, the court must search for factors which establish direction or control from the forum, and, third, the court must look for factors which establish a flow of benefits or funds to and from the forum such that the defendant may be said to have purposefully availed itself of the benefits and protections of the forum.

In considering the first factor, the relationship between the affiliated corporate parties, the factors may be broken down further into (1) whether or not such a relationship actually exists, and (2) consideration of the nature of the relationship, *i.e.*, the degree of control exercised or identity shared.

The court finds the first factor, "the existence of a relationship" between UTI and the Carolina defendants, to have been met in that UTI owns one hundred percent (100%) of the stock of all of the subsidiary corporations listed in plaintiff's complaint, with the exception of Citizens Ice Company, of which UTI owns ninety-nine and $^{06}/_{100}$ percent (99.06%), and Rixon, Inc., a subsidiary of United Business Communications, of which UTI owns twenty-four percent (24%) of the stock. The court also finds that the filing of consolidated tax statements is demonstrative of the existence of the relationship. The court further finds that the identification of the defendant subsidiaries as part of the United Telecommunications, Inc., or as part of United Telecom, establishes the existence of a relationship between these corporate affiliates. Additionally, the court finds the efforts of UTI to project a unified image to the public, via press releases, advertising and publications, establishes the existence of the relationship between these corporate affiliates. Further, UTI established a corporate identification program designed with the purpose to cause the public to identify the defendant subsidiaries with the parent holding company, UTI. See § 0.70, UTI Operations Manual.

To determine the weight to be given to the factor of "existence of the relationship," the court must now look toward the nature of the relationship, *i.e.*, the degree of control or identity exerted by the one corporate affiliate over the other. The degree of control which UTI exerted over all its subsidiary corporations, including the Carolina defendants, can best be demonstrated by a review of a document entitled "Operations Manual." (Plaintiff's Exhibit No. 1.) This document is utilized by UTI as a means of disseminating to its subsidiaries *mandatory* policies, practices and procedures.

In § 0.01, ¶ 2.0, under the heading "The Operations Manual," this document states: "The Operations Manual and all of its contents convey corporate policies and objectives which are considered to be *mandatory* upon the service company *and* the telephone operating subsidiaries." (Emphasis supplied.) In ¶ 2.4, under the heading "Distribution", it is stated: "The policies and objectives stated in the Operations Manual become those of the Presidents and officers and should be conveyed to people in the organization who have a need to know." A quick survey of the contents of the Operations Manual demonstrates that it sets policies regarding (1) United System Public Affairs policy on a national level, (2) management policy regarding interviews with business customers, (3) UTS collection policies, (4) equal employment opportunity policy, and (5) corporate contributions policy, political contributions policy, as well as corporate policy regarding personal behavior and integrity. The court finds the existence, dissemination and implementation of the Operations Manual from UTI to its subsidiaries demonstrative of the significant degree of control emanating from the forum through the parent corporation to the non-resident defendant subsidiaries.

In addition to the mandatory policies outlined in the Operations Manual, UTI and USSI issue United System Practices. (Plaintiff's Exhibit No. 2.) Section 0.01, ¶ 3.0 of the Operations Manual states the purpose of the United System Practices.

"... System practices are issued when it is felt that specific, more detailed guidance is needed in certain areas to insure uniformity throughout the System or to provide needed guidance to operating company personnel...."

The origination of the content of these practices lies with one of the staff entities at the parent company. (¶ 3.1.) Although not all of the United System Practices are mandatory, the following are mandatory: (a) accounting, financial and fiscal practices; (b) data processing practices; and (c) practices which require uniform reporting or statistical information which is summarized and utilized by the service company for the benefit of all companies. Any prac-

tices which are issued by the Service Company which fall outside the above three mandatory categories are issued for general guidance and direction only. At times, however, even practices which fall outside the above three categories will be considered mandatory and such will be designated on the practice itself. (¶ 3.3.)

Reviewing these two manuals and their respective policies, the court finds the degree of control emanating from the parent corporation to the subsidiaries to be extensive and therefore deserving of great weight in this court's determination of whether or not there have been sufficient minimum contacts between the forum and the Carolina defendants such that the exercise of jurisdiction over those defendants would not offend traditional notions of fair play and substantial justice.

The court now turns its attention to the second factor outlined in *Energy Reserves* regarding "direction or control" of the non-resident corporation *from* the forum. Again, the court notes the existence of the Operations Manual and United System Practices which originate with the staff entities at the parent company within the forum and are in turn disseminated to the affiliate companies. These manuals establish uniform policies in many significant management areas within each subsidiary. Although not all the policies or practices are mandatory, many are. Moreover, the parent company need only designate on any United System's practice that said practice is mandatory and it becomes so. (United Operations Manual, § 0.01, ¶ 3.3.) The affiliates have no control over which practices may be designated mandatory; the decision lies solely within the control of the parent corporation within the forum. The court also finds the forum corporation exercises a considerable degree of control or direction of control over the area of personnel functions of the defendant subsidiaries in their high level management positions. Turning to the Operations Manual, § 1.5, the court finds that it is the prerogative of the forum parent company to *approve* nominations and salary proposals which are to be presented concerning the following

officers of each subsidiary: Chairman of the Board, President, Vice President, Assistant Vice President, Treasurer, Controller, Secretary and General Counsel. Moreover, the court notes that although this function is stated as "a prerogative," it is one which *will be* exercised with respect to those positions. The directive specifically states:

> "Because of their important role as officer-candidates, the selection of department heads *is to be cleared with the Headquarters' vice president* in charge of industrial relations or his designee before being made firm and before discussion with the candidate. Although circumstances will sometimes differ, it is our intent merely to assure that known candidates from other locations are given consideration, and, on occasion, to exercise a *veto* against proposals which appear inconsistent with *our* development needs." (Emphasis supplied.) Operations Manual, § 1.5.

The court finds this section of the Operations Manual demonstrates that UTI exercises considerable control over its subsidiaries in the selection of their high level management personnel.

The court finds further direction or control emanating *from* the parent company to each subsidiary in that each subsidiary board of directors is required to elect one or more inside directors from the parent company officers to serve on each subsidiary board.

The court also notes a substantial degree of financial control is exercised by UTI over its subsidiary companies. The financial control ranges from the requirement that all subsidiaries use uniform accounting and financial and fiscal practices to substantial control in the budgeting area of each subsidiary defendant and to control over the overall financial structure of each subsidiary. Further, UTI directs and controls the amount and timing of dividends paid by each subsidiary defendant, and often has a voice regarding major financial decisions of each subsidiary.

In addition, the subsidiary defendants are required to make the following reports on a regular basis to UTI and USSI:

(1) monthly operating statistics reports;

(2) monthly president's letter;

(3) monthly operations report;

(4) monthly financial reports;

(5) monthly collection reports;

(6) business marketing reports;

(7) human resources reports;

(8) monthly employment activity reports;

(9) copies of EEO–1 forms;

(10) employment turnover data reports;

(11) management activity reports;

(12) employee count figures;

(13) terminations and transfer reports;

(14) employee record systems reports;

(15) monthly contract labor reports; and

(16) payroll and employee benefit payment reports.

The court finds the forum corporation exercises substantial direction and control over its subsidiaries. This control surfaces in personnel selection, budgeting and other financial areas, in implementation of standard uniform mandatory policies throughout the United Telecom System via each subsidiary, and in required record keeping and reporting generally. Control or direction of control this substantial must be given great weight by the court in making its determination of the existence of jurisdiction.

The last factor which the court will consider in regard to whether or not there are sufficient minimum contacts, ties or relations between the forum and the subsidiary defendants so as not to offend traditional notions of fair play and substantial justice, thereby making the exercise of jurisdiction constitutional, is the determination of the flow of benefits to and from the forum. Simply stated, the court must determine whether or not the defendant subsidiaries have purposefully availed themselves of the benefits and protections of the laws of the forum such that requiring them to ap-

pear and litigate within the forum would not be unfair.

In order to establish this final factor, the court finds it necessary to examine and outline the overall structure of the UTI corporation and its subsidiaries. At the time this action was filed, defendant USSI was a Kansas corporation, wholly owned by defendant UTI, a Kansas corporation with its principal place of business in Westwood, Kansas. USSI was formed as a service company whose purpose was to provide all necessary management, professional, financial, technical and advisory services to the management of United Systems companies to achieve the most efficient and purposeful operation of the United System and each of the United System companies. Each time a new telephone operating subsidiary company was acquired or formed, it was required to enter into a service agreement with USSI which provided that the officers, agents and employees of USSI were to provide various services to each subsidiary company.

Specifically, the services available to all subsidiary companies of United Telecommunications, Inc. were in the area of finance, general legal counsel, corporate operations and administrative operations. Costs for services rendered to UTI and the other United System companies (the subsidiaries) were to be billed on the following basis: (1) all specifically identifiable costs of particular services rendered for any single United System company shall be charged to and paid by that company; (2) all specifically identifiable costs for particular services rendered for more than one United System company, but not all such companies, shall be charged to and paid by the companies for which the services are rendered; the costs incurred for such services which *cannot be separately ascertained* for each company shall be allocated fairly among *all* such companies receiving such services; and (3) all costs associated with the general administration of the service corporation and costs incurred for all services performed for or furnished to all United System companies generally, and/or all other costs not described in (1) or (2) above are to be allocated among all

United System companies on an equitable basis. It appears, therefore, that services rendered in the forum state by USSI directly benefitted the Carolina defendant subsidiaries in their respective states. Each subsidiary was required to seek the aid of USSI. Often times employees of the subsidiaries came to the USSI facility to use the equipment or to seek training. Moreover, it appears that the billing method used by USSI to charge the respective subsidiary defendants for services USSI performed resulted in subsidiaries receiving substantial benefits at less than market value, and at times it resulted in the defendant subsidiaries receiving benefits which were partially financed by other subsidiaries.

Other benefits of a financial nature also flowed from the forum state to the Carolina defendant subsidiaries inasmuch as UTI often made direct monetary advances to the subsidiaries, often times in the form of equity financing, thereby causing the issuance of additional stock of the subsidiary which was then purchased by UTI.

Another area representative of the flow of benefits to and from the forum is in the general area of personnel. In an effort to aid its ability to actively plan for future human resource requirements, and to effectively develop employees in order to meet the upcoming requirements, as well as to fulfill or satisfy the personal growth objectives of individual employees, UTI issued a United System Practice regarding personnel which was designated a *mandatory* practice.

This practice, entitled Human Resource Planning, is applicable to all telephone operating companies within the United System, and provides that the Human Resource Planning Department of UTI, the parent company, would maintain information files on key management employees, that is, on employees who are hired, transferred or promoted into a salary grade position of 16 or above. The information files would contain necessary data in order to ascertain the development needs of the individual, project future management va-

**1476**

cancies and provide the telephone operating companies with candidate information for specific management vacancies. The documents which make up the Human Resource plan are three in nature: (a) personal inventory form, (b) employee data records, employee information records or payroll change reports, and (c) performance summary and estimate of potential for advancement forms. Upon completion of the forms, and verification by the personnel department of each individual company, the records are sent directly to the USSI Human Resource Planning Department. Upon reaching the Human Resource Planning Department of USSI, located in Westwood, Kansas, the report is used as a beginning point and a tool for top management's use in analyzing the current and future human resource needs of the United Systems organization.

As noted earlier, the Human Resource Planning Department maintains and establishes a "data bank" on employees who attain grade level 16 and above. This "data bank" can be utilized or searched by any and all subsidiary companies and the parent company to find suitable candidates for high level openings or positions. The court must also note that UTI and USSI, both located in the forum state, provide a United System retirement plan for the benefit of all employees, including employees of the defendant subsidiaries. In 1976, of the 28,226 employees of UTI and its subsidiaries, 26,075 employees participated in the United System retirement plan.

The court finds these facts conclusively show that extensive benefits were flowing both from the forum to the subsidiary corporations and vice-versa, such that the last element of purposeful availment has been substantially demonstrated.

Other factors which must be considered in the due process analysis are the inconvenience of litigation in the forum and whether the claim asserted arises in the forum. The court finds that inasmuch as general counsel for UTI and all of its subsidiary corporations are located within the forum state, and further that general counsel of USSI provides legal services and advice to operating companies in conjunc-

tion with matters involving securities commission administrative bodies, as well as legal advice with respect to corporate minutes, charters or articles of incorporation, tax matters and patent matters, it would not be a burden for the Carolina defendants to be required to come into this forum to litigate the case at bar. The court does not find the factor of inconvenience to weigh heavily in this matter. Moreover, it appears that employment records which are maintained on a systemwide basis are substantially located within the forum, and further many witnesses with evidence relating to selection of high level or grade 16 or above positions are located within this state, thereby again substantially lessening the weight which the court will give to the factor of inconvenience.

Last, the court finds the claim arises in the forum in that plaintiff was employed by USSI and claims she was injured by their actions at their facility in Kansas.

Weighing all the evidence before it, and again noting that when the existence of personal jurisdiction is controverted, a plaintiff need only establish a *prima facie* case that the constitutional and statutory requirements for the assumption of personal jurisdiction are satisfied, the court finds plaintiff has substantially met the burden of establishing the existence of minimum contacts between the forum and the subsidiary Carolina defendants such that traditional notions of fair play and substantial justice will not be offended by requiring the Carolina defendants to defend this action within the forum.

### SERVICE OF PROCESS

The court now turns its attention to whether or not service of process was proper such that jurisdiction may properly be asserted over the subsidiary defendants. Since all thirty-eight subsidiary defendants raised improper service of process in their motions to dismiss, the following discussion refers to both the motions of the Carolina defendants to quash service and to the Capitol City defendants' motions to quash service.

The specific issue before the court for determination is whether service upon Paul H. Henson, the Chief Executive Officer of UTI and USSI in Kansas, constituted effective service upon all thirty-eight subsidiary corporations.

Plaintiff asserts that service was properly obtained over these defendants on three different bases. First, plaintiff asserts defendants UTI and USSI are "managing or general agents" of the remaining defendants, pursuant to Federal Rule of Civil Procedure 4(d)(3). Second, plaintiff asserts service on Paul Henson, the Chief Executive Officer of UTI and USSI, constituted service on all subsidiary defendants in that the offices of UTI and USSI in Westwood, Kansas, qualify as "any business office of the defendant," and further that Paul Henson is the "person having charge thereof." K.S.A. 60–304(e) and Federal Rule of Civil Procedure 4(d)(7) and 4(e). The last theory asserted by plaintiff as providing proper service is that service upon Paul Henson, Chief Executive Officer of UTI and USSI, is sufficient under both the federal and state citations noted above in that UTI and USSI are the alter egos of the remaining thirty-eight subsidiary corporations.

The court has considered plaintiff's arguments offered in support of the managing or general agent theory and the business office theory and finds them insufficient to establish proper service of process. Having found these two theories insufficient, the court now examines plaintiff's theory that UTI and USSI are the alter egos of the moving defendants, and therefore service upon the parent corporation in the forum is sufficient so as to constitute appropriate service on the remaining defendants pursuant to Rule 4(d)(3) of the Federal Rules of Civil Procedure, and Rule 4(d)(7) and K.S.A. 60–304(e).

Although Judge Theis, in *Energy Reserves, supra,* found that alter ego principles had no place in the determination of judicial jurisdiction after the rulings of *International Shoe, supra,* and *Shaffer, supra,* he did recognize the viability of the alter ego doctrine and its principles in cases that

"... raised the statutory issue of the sufficiency of the method of service under state or federal law—namely, whether a particular statute authorized service on a given defendant. Thus, if a statute authorized service on 'anyone who does business in the forum,' satisfaction of the alter ego test was necessary to permit service, under the statute and Rule 4(e), Fed.R.Civ.P., on a non-resident who did business in the forum through an alter ego corporation. Alter ego principles might thus be an appropriate device to extend extraterritorial service to persons not specifically within the literal ambit of the statute or rule that authorized service.

"Similarly, if a non-resident corporation was not personally served, but rather received service solely on its subsidiary in the forum, as in *Cannon,* then alter ego analysis was necessary to resolve the issue of the sufficiency of the manner of service. Alter ego principles essentially would permit treatment of two corporations as one. Domestic service on a subsidiary corporation in the forum would be sufficient, under Rule 4(d)(3) or (d)(7), Federal Rules of Civil Procedure, for service on the non-resident corporation. In neither statutory situation, however, would the *Cannon* doctrine or alter ego principles bear on the constitutional power of the state to authorize that service."

*Id.,* 460 F.Supp. at 503.

Accordingly, the court must determine whether or not UTI and USSI are alter ego corporations of the remaining thirty-eight defendants such that service upon Paul Henson, Chief Executive Officer of UTI and USSI, may be deemed to have been proper service on the remaining defendants.

In *Quarles v. Fuqua Industries, Inc.,* 504 F.2d 1358, 1362 (10th Cir.1974), the court acknowledged the Kansas alter ego law:

"... Under this doctrine, the corporate entity is disregarded and liability fastened on an individual who uses the cor-

poration merely as an instrumentality to conduct his own personal business....

\* \* \* \* \* \*

"Thus a holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity.... Circumstances justify disregard of the corporate entity if separation of the two entities has not been maintained and injustice would occur to third parties if the separate entity were recognized...." (Citations omitted.)

*Id.* at 1362.

■ The fact that one corporation may own all the stock of another and may further select from its own directors and officers a majority of all the directors of the other corporation, or the fact that a parent finances the subsidiary, is not sufficient, standing alone, to warrant disregard of the corporations as separate entities. However, "where from all the facts and circumstances it is apparent that the relationship between the parent and its subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two so mingled, that recognition of the distinct entity would result in an injustice to third-party persons, courts will look through the legal fiction of separate entity and treat them as justice requires." *Schmid v. Roehm GmbH,* 544 F.Supp. 272 (D.Kan.1982), *quoting International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, et al. v. Cardwell Mfg. Co., Inc.,* 416 F.Supp. 1267, 1286 (D.Kan.1976).

■ The Tenth Circuit Court of Appeals, in *Fish v. East,* 114 F.2d 177, 191 (10th Cir.1940), established ten criteria to aid courts in determining whether a subsidiary is such an instrumentality of the parent corporation that treating the two as one is necessary. The court stated that the determination as to whether a subsidiary is an instrumentality is primarily a question of fact and degree. The following determinative circumstances are recognized: (1) the parent corporation owns all or a majori-

ty of the capital stock of the subsidiary; (2) the parent and subsidiary corporations have common directors or officers; (3) the parent corporation finances the subsidiary; (4) the parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation; (5) the subsidiary has grossly inadequate capital; (6) the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (8) in the papers of the parent corporation, and in the statements of its officers, the "subsidiary" is referred to as such or as a department or division; (9) the directors or executives of the subsidiary do not act independently in the interest of the subsidiary, but take direction from the parent corporation; and (10) the formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

As Judge Rogers noted in *Cardwell, supra,* these ten criteria are merely guidelines to aid the court in making its determination. They merely summarize factors that should be considered in making a determination as to whether corporate entity will be disregarded. Judge Rogers further noted that Kansas courts have always been liberal in indicating "a tendency to disregard the theory of a corporation as an entity separate from its incorporators where justice between the real parties to the transaction requires it." *Cardwell, supra,* 416 F.Supp. at 1286, *quoting Coal Co. v. Nicholson,* 93 Kan. 638, 653, 145 P. 571 (1915); *Avery v. Safeway Cab, T. & S. Co.,* 148 Kan. 321, 326, 80 P.2d 1099 (1938); *Cities Service Co. v. Koeneke,* 137 Kan. 7, 20 P.2d 460 (1933).

In addition to the ten above-enumerated guidelines for making a determination of alter ego, it must be shown that honoring the legal fiction of separateness would result in injustice. Simply stated, it must also be shown that the use of a separate corporate structure results in inequitable conduct towards plaintiff or toward anyone else.

Plaintiff urges the court to note that in this motion to dismiss the court is not faced yet with the question of holding the parent corporation *liable* for the acts of its subsidiary corporation or vice versa. At this juncture of the proceedings, the examination of the corporate structures of the defendant parent corporation and the subsidiaries is for jurisdictional purposes only, and not for the purpose of subjecting the parent corporation to substantive liability for the acts of the subsidiary or vice versa. Plaintiff, therefore, makes the argument that a different standard of review should be appropriate when the alter-ego theory is being used to support service of process only and not liability.

Although the court believes there is merit and support for plaintiff's argument [see *Rollins v. Proctor & Schwartz,* 478 F.Supp. 1137, 1143, n. 13 (D.S.C.1979); *Rea v. An-Son Corp.,* 79 F.R.D. 25 (W.D.Okl. 1978); *Reul v. Sahara Hotel,* 372 F.Supp. 995 (S.D.Tex.1974); *Energy Reserves, supra,* 460 F.Supp. 483], the court finds that plaintiff can meet the more rigorous test for establishing alter ego, and the court therefore declines the invitation to recognize or apply a more lenient standard on the question of the propriety of service.

Thus, the court must determine whether the underlying unity between the parent corporation, UTI, and the subsidiary corporations is such that the parent conducts the subsidiary's business and controls its policies such that the subsidiaries are mere adjuncts and instrumentalities of the parent.

Applying the ten criteria in *Fish v. East, supra,* the court finds the evidence is overwhelming that the parent corporation exerts such dominion and control over the subsidiary corporations that they do not in reality constitute separate and distinct corporate entities, but are one and the same corporation under an alter ego analysis, and thereby finds that service of process on Paul Henson, Chief Executive Officer of UTI and USSI, was appropriate service on the remaining defendants pursuant to Rule 4(d)(3) of the Federal Rules of Civil Procedure and Rule 4(d)(7) and K.S.A. 60–304(e).

The court will now proceed to apply the facts of this case to the factors enumerated in *Fish v. East, supra.*

It is undisputed that UTI owns one hundred percent (100%) of the stock of all the subsidiary corporations enumerated in plaintiff's complaint, the only exceptions being Citizens Ice Company, of which UTI owns ninety-nine and $^{06}/_{100}$ percent (99.06%), and Rixon Inc., a subsidiary of United Business Communications, of which UTI owns twenty-four percent (24%) of the stock. Hence, it can be concluded that the parent corporation, UTI, owns all or a majority of the capital stock of its operating subsidiary companies. Moreover, UTI, by holding one hundred percent (100%) stock ownership of all telephone operating companies, not only had the right to control the nature of the business of the operating subsidiary companies, but further exercised that control via directives in the Mandatory Operations Manual and directives in the United System Practices, many of which were also mandatory. UTI and its subsidiaries also had substantial numbers of common officers and directors. The directives of the Operations Manual, § 1.53, required that there be one or more inside directors elected from the parent company officers on each operating subsidiary company board.

At the time service of process was completed in this case, UTI had divided several of its subsidiaries into six major groups. All of the subsidiaries within each group of UTI subsidiaries had the same president and same officers. At the time of service of process, the six groups were designated as the Mid-West Group, the Eastern Group, the Southeast Group, the Indiana Group, the Northwest Group, and the Texas Group. Since service of process in this case, UTI has also consolidated other individual subsidiaries into an additional group called the Florida Group. The officers and staffs of each respective group provide managerial, financial, professional and technical advice and assistance to all subsidiaries within that respective group.

There have been several individuals who were simultaneously officers of UTI and

UTI subsidiaries. The court further notes the president of UTI selected the president of each subsidiary, determined his salary and his salary increases. Moreover, the president of UTI played a direct role in selecting directors for the subsidiary boards of directors.

In conclusion, the court finds plaintiff has sufficiently demonstrated that for all practical purposes the first requirement of "common directors and officers" has been met. The court finds that the facts which plaintiff has presented illustrate extensive control and coordination by UTI of its various subsidiary companies. The court also notes that at the time of service of process in this action, UTI had representation of fifty percent (50%) or more on several boards of its various subsidiaries. Although the companies in which UTI had fifty percent (50%) or more representation on the board were not telephone operating companies, the court finds that UTI representatives still comprised a significant percentage of several boards of telephone operating companies, *i.e.*, thirty-three percent (33%) in United Telephone Company of the Carolinas, and twenty-five percent (25%) in Palo Pinto Telephone, United Telephone Company of Ohio, United Telephone Company of Pennsylvania, and West Jersey Telephone. Again, the court notes that plaintiff has demonstrated sufficient evidence to support a finding that there was substantial overlap and commonality among directors and officers of the parent corporation and the various subsidiary corporations.

Plaintiff has also demonstrated sufficient facts to establish the existence of a close financial relationship between the parent corporation and the various subsidiary defendants. As has been noted by the court earlier herein, UTI mandated, via its United System Practices, that all subsidiary corporations follow identical accounting, financial and fiscal practices. In other words, it mandated the accounting procedures to be used by each subsidiary. The court further notes that UTI and its subsidiaries filed consolidated financial statements and federal tax returns. Furthermore, the accounting department at UTI prepared consolidated financial reports for UTI and the various subsidiaries to be submitted to the S.E.C., I.R.S. and other regulatory agencies and authorities. It also appears the charge for services extended to each subsidiary through USSI allowed each subsidiary to receive a financial benefit at the expense of other subsidiaries. The service agreements in effect between USSI and each individual subsidiary did not prescribe a specific allocation method. The cost allocation method included attribution of USSI expenses to non-telephone subsidiaries and to UTI on the basis of an estimate of the resources actually devoted to serving each of them.

It has also been shown that the various UTI subsidiaries paid for ninety to ninety-five percent (90% to 95%) of the cost of the UTI general counsel's office during the years 1975 and 1976. The amounts paid for the use of this building are calculated to allow USSI a return on its investment in the building. The FCC and various state regulatory utility commissions have approved these payments by the subsidiaries. It must be noted, however, that USSI can only earn this allowed return through the collection of charges from entities which actually use the building. It must be concluded, then, that those who contributed did actually use the building. The court further notes that in 1976 the telephone operating subsidiaries paid USSI for the use of the headquarters building.

Other areas of financial control are demonstrated in that the Operations Manual, § 0.50, mandated that commercial paper would not be used by a subsidiary unless specifically *authorized in advance* by the parent company. That section further states that all changes in the amount of credit lines or in banking relationships must be approved by the Finance Division of United Telecom. This section also states that the parent company will make advances to subsidiaries which are unable to borrow at prime rate and which subsidiary companies have reached the limits of authorized debt ratios. It is further noted that UTI set the debt-to-equity ratio of its subsidiaries. Moreover, UTI also required ap-

proval be obtained from it before any subsidiary made any major equipment purchase. The court finally notes that UTI agreed in its debenture-indenture to pay or discharge, or cause to be paid, charges incurred by the subsidiaries. The court finds this type of control over the actions of the subsidiaries on the part of UTI demonstrates the significant influence UTI has over the financial affairs of the respective subsidiary corporations.

The court also notes the substantial control UTI exercised over the budgets of the respective subsidiary corporations. In § 6.06 of the Operations Manual, each president of each subsidiary corporation was directed to analyze his own current condition and establish goals and objectives which are consistent with the parent company goals. The president was then directed to submit an annual budget, as well as a five-year budget forecast, to UTI for review and approval. The court further notes that UTI retained copies of the subsidiaries' letters of credit on file at their home office, and further that UTI maintained a daily computer count of the borrowings of each company.

The court now turns to an examination of the unified public image which UTI sought to project. The court finds UTI and its subsidiaries attempted to project to the public an image of being a unified, interdependent, single company. The unified public image was projected through the display of a standard nine-square emblem and logo trade mark and standard vehicular colors. A unified image was further projected through implementation of standardized letterheads and business cards, and the display of an official flag flown by subsidiary corporations on special occasions. Jackets, t-shirts and patches with the UTI logo were made available to all employees of the subsidiaries in a further effort to promote a unified image and esprit de corps. To devise this unified image, UTI created the Corporate Identity Program, the function of which was to help the company gain stature among customers, employees, investors, governmental agencies and the general public. The attempt to create this unified public image can best be summed up by a quote from plaintiff's Exhibit No. 146, entitled "Unveiling a United Identity", whereby it is stated:

"And soon, the many publics with whom the United *family* deals will begin to understand that United is 25,000 men and women strong, that it carries on major telephone and non-regulated operations across the nation, *and that its many subsidiary companies are joined under one corporate banner.*" (Emphasis supplied.)

UTI, in its effort to create a unified public image, also exerted significant control over all advertisements produced and published by subsidiary companies. In the Operations Manual, § 0.70, it was stated that the parent company Public Relations/Advertising Department would be responsible for directing all corporate financial and institutional advertising, as well as facilitating subsidiary company sales promotion advertising upon request.

UTI further attempted to create a more unified image among its own employees and the employees of the subsidiaries. For example, when referring to the parent company in the Operations Manual § 0.70, all employees were urged to practice the usage of referring to the parent company as United Telecom, rather than by its initials, UTI, and to encourage others to do the same. Further, UTI developed a system-wide service award program, and mandated that all United Telecom companies were to participate in the program.

The court further finds that the directors and executives of the subsidiary corporations did not act independently in the interest of each subsidiary corporation, but rather made decisions and took actions for the benefit of the company as a whole. The court finds that the mandatory policies established in the Operations Manual, and the policies of the United Systems Practices, both of which were written and sent out by the parent corporation, were sufficient to control the day-to-day activities of the respective subsidiary corporations.

Where it is shown, as in the case at bar, that the decisions made by the subsidi-

ary are made under the domination of the parent, as dictated by mandatory policies and procedures, such a showing is sufficient to establish an alter ego relationship.

The court notes that defendants have cited several cases wherein courts have rejected the contention that a telephone holding company is the alter ego of its operating subsidiary companies. The court finds the case of *Mooncarrier v. Reliance Ins. Co.*, 153 N.J.Super. 312, 379 A.2d 517 (1977), unpersuasive in that the subsidiary in that case did not have an obligation to accept and follow the advice of the parent company. In the case at bar, however, the policies issued by UTI, via its Operations Manual and several of the United Systems Practices, were mandatory upon the subsidiaries. In this case, the parent corporation not only had the opportunity to control the subsidiaries, but exercised that opportunity.

The court likewise finds the case of *San Antonio Telephone Co., Inc. v. American Telephone & Telegraph Co.*, 364 F.Supp. 1157 (W.D.Tex.1973), *aff'd.* 499 F.2d 349 (5th Cir.1974), unpersuasive in that it particularly addressed the jurisdictional standard of the Clayton Act. The court further finds the cases of *Magyar v. American Telephone & Telegraph Co.*, 88 N.J.Super. 18, 210 A.2d 434 (1965), and *N-Triple-C Inc. v. American Telephone & Telegraph Co.*, 377 F.Supp. 813 (E.D.Pa.1974), inapposite to the case at bar.

▆ The court now examines the last remaining element necessary to the establishment of an alter ego theory, that is, that a finding of separate entities would result in injustice. Establishing the injustice requirement does not require a showing that the co-mingling of the corporations was for the purpose of causing injustice, nor need the injustice be shown to amount to fraud. *Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d 645 (10th Cir.1980). Furthermore, there is no need to show that the two or more corporations acted in concert in bringing about the particular harm alleged by a plaintiff.

The court finds that UTI exercised a high degree of control over the personnel policies in all the corporate subsidiaries. UTI had a structured system for identifying employees for inter-subsidiary transfers. This system was monitored by the Manpower Planning Section of UTI, which conducted system-wide searches for inter-subsidiary movement of employees for high level positions. UTI also maintained a system-wide job pool, which was monitored and controlled by UTI and USSI. Promotions to higher levels within USSI and UTI and within the other subsidiaries came from this system-wide job pool.

The Operations Manual, § 0.03, included a list of fundamental objectives the parent, UTI, wished to achieve. This list was entitled "Role of the Parent Organization in the Achievement of Objectives." Specifically, paragraph 6 of this list stated:

"6. Provide the means for greater job opportunities for ambitious and able employees, and a larger pool from which such talent may be drawn as needed throughout the System."

Having found the involvement of UTI in the personnel policies and practices of the respective subsidiaries to be so substantial as to amount to control over the personnel policies and practices of the subsidiaries, the court finds it would be unjust to plaintiff to treat these corporate entities separately. When the lack of independence and the blurring of separateness is so substantial, as it is in the case at bar, treating the parent corporation and the respective subsidiaries separately would amount to injustice.

The court finds, therefore, in the case at bar, circumstances justify disregard of the corporate entity.

▆ The court finds that the parent corporation, UTI, and its respective subsidiaries do hold themselves out to third parties, and to the public generally, as one entity. The court therefore finds it would be unjust, after UTI has represented itself and its subsidiaries to the public as one, and after UTI has represented itself and its subsidiaries to plaintiff and its other em-

ployees as one, to allow UTI and its subsidiaries to hide behind two separate corporate structures and escape the consequences of their acts, which may very well have resulted in damage to a third party, who in this case is plaintiff. To make a determination of alter ego, the court must ascertain from the total facts the extent of actual control exercised by the parent over the internal affairs of its subsidiaries. The Kansas Supreme Court has stated that when dealing with the parent-subsidiary separation the court must deal "with the realities of the situation." *Cities Service Co. v. Koeneke, supra,* 137 Kan. at 29, 20 P.2d at 471.

 It must further be noted briefly that the principle objective or purpose of service of process is to give to the other party notice of the proceedings against him. It is the means by which he may be afforded the opportunity to appear and be heard. As stated in Wright & Miller, *Federal Practice & Procedures:* Civil, § 1083, "[t]he general attitude of the federal courts is that the provisions of Rule 4 should be liberally construed in the interest of doing substantial justice and that the propriety of servicing each case should turn on its own facts within the limits of the flexibility provided by the rule itself. This is consistent with the modern conception of service of process as primarily a notice-giving device...."

Where, as here, the defendants have received actual notice of the impending action, the United States Supreme Court has recognized that actual receipt of notice is a fact to be considered in the determination of whether valid service has been made. See *Milliken v. Meyer,* 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1940); *Hanna v. Plumer,* 380 U.S. 460, 463, fnt. 1, 85 S.Ct. 1136, 1139, fnt. 1, 14 L.Ed.2d 8 (1965).

As the facts in this case have shown, service upon Paul Henson, the Chief Executive Officer of UTI and USSI, was notice "reasonably calculated" to apprise all subsidiaries of the pendency of the action since it is uncontroverted that all of the subsidiaries did receive notice of the action as the result of service on Paul Henson.

As W.E. Baker, General Counsel of UTI, testified in his deposition on August 4, 1980, at p. 311:

"Q. You are saying, though, that someone in your office called each and every subsidiary?

"A. I am sure that we called every operating company.

"Q. Which officer would you have talked to in the operating companies?

"A. It would have been the president. It would not have been anyone else."

Further, it is uncontroverted that all of the defendants objecting to jurisdiction, service or venue filed their responsive pleadings within twenty (20) days after service, indicating clearly that UTI and USSI knew what their duty was when served with process and fulfilled that duty.

Viewing the circumstances and facts of this case as a whole, the court finds the circumstances justify disregard of a separate corporate existence of UTI, the parent corporation, and the thirty-eight named subsidiary defendants. The court finds UTI exercises such dominion and control over its subsidiaries that they operate as one entity. The requirements for a finding of alter ego have therefore been met.

The court finds the statutory requirements and the due process requirements for valid service of process have been observed, and accordingly the service of process will stand.

The court now turns its attention to the Carolina defendants' objection to venue. Title VII of the Civil Rights Act contains its own venue provision in 42 U.S.C. § 2000e–5(f)(3), which states:

"... Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the

alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office...."

As has been previously stated, the practices and procedures relating to personnel and management of employees are established and implemented by UTI and USSI in the District of Kansas for all of the defendant subsidiaries. Plaintiff's complaint alleges that the parent company, UTI, and its subsidiaries have engaged in system-wide discrimination based on sex, and have thereby harmed her and other women similarly situated. The court finds the alleged unlawful employment practice to have taken place in the district of Kansas due to the control exercised by the parent corporation, UTI, in regard to its development and enforcement of its personnel policies and practices. Accordingly, the court finds the first venue provision of 42 U.S.C. § 2000e–5(f)(3) to have been met by plaintiff. Venue is, therefore, proper in this judicial district in that the unlawful employment practice is alleged to have been committed here.

The court further notes that a substantial number of employment records relevant to the alleged discriminatory practice are maintained in this district, and, therefore, the second provision of 42 U.S.C. § 2000e–5(f)(3) has also been met.

In summary, the court finds plaintiff has established a *prima facie* case that the constitutional requirements for personal jurisdiction are satisfied. The court finds that the subsidiary defendants have sufficient minimum contacts with the forum such that traditional notions of fair play and substantial justice will not be offended by requiring these defendants to defend in this forum. The court further notes that service of process was proper upon all subsidiary defendants in that service upon the parent corporation as the alter ego of the subsidiary defendants was sufficient to constitute service upon the thirty-eight subsidiary defendants. The court must also note at this juncture that all defendants did receive actual notice and responded within twenty (20) days of service of process upon the parent corporation. Lastly, the court finds venue to be proper within the District of Kansas in that this is the judicial district in which the alleged unlawful employment practice is said to have been committed. Alternatively, as to venue, the court finds a substantial number of employment records relevant to the alleged discriminatory practice are maintained within this district, and therefore venue is also proper in this regard.

The court has not attempted to meet each proposed finding of fact submitted by plaintiff and defendants, and therefore notes that it is not required to make findings on factual questions which are unnecessary to the result reached. *Immigration & Naturalization Service v. Bagamasbad*, 429 U.S. 24, 97 S.Ct. 200, 50 L.Ed.2d 190 (1976). This court's findings are clear, specific and complete enough to inform the parties and a reviewing court, if necessary, of the basis for its decision. *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1186 (10th Cir.1975).

On the basis of these findings of fact, the court makes the following conclusions of law.

This court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202 and 42 U.S.C. 2000e–5(f). This court may constitutionally and statutorily exercise personal jurisdiction over all the defendants named in that said defendants have minimum contacts with this forum such that maintenance of this suit does not offend traditional notions of fair play and substantial justice. The court finds that service on the moving defendants was proper in that UTI and USSI are the alter egos of the remaining subsidiary defendants. The court further finds venue to be proper within the judicial district of Kansas pursuant to 42 U.S.C. § 2000e–5(f)(3) in that the unlawful employment practices are alleged to have been committed in this district, and, further, that a substantial number of employment records relevant to this alleged employment

discrimination are maintained in this district.

IT IS BY THE COURT THEREFORE ORDERED that the Carolina defendants' motion to dismiss on the basis of lack of personal jurisdiction and venue, and the Carolina defendants' motion to quash service of process, are hereby denied. IT IS FURTHER ORDERED that the Capitol City defendants' motion to quash service is hereby denied. IT IS FURTHER ORDERED that these defendants are directed to file responsive pleadings within twenty (20) days of the date this Memorandum and Order is filed. IT IS FURTHER ORDERED that defendants' motion for leave to file a memorandum in reply to plaintiff's and plaintiff-intervenor's memorandum in response to moving defendants' memorandum in support of their motions to dismiss is hereby granted.