Richard **TURNLEY III, Baron H.C. Finlayson, Coleen Alecia Hinds, Mark–Anthony Brown, Timothy Johnson II, and Khairi Dwayne Rahman on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**BANC OF AMERICA INVESTMENT SERVICES, INC., and Bank of America, N.A., Defendants.**

**Civ. Action No. 07cv10949–NG.**

United States District Court, D. Massachusetts.

Sept. 17, 2008.

McCutchen LLP, Boston, MA, Eric H. Holder, Jr., Jeffrey G. Huvelle, Thomas S. Williamson, Covington & Burling LLP, Washington, DC, for Defendants.

Matthew P. Jubenville, Deval R. Karina Zaveri, Niki L. Mendoza, Bernstein Litowitz Berger & Grossmann LLP, San Diego, CA, Ellen J. Messing, Messing, Rudavsky & Weliky PC, Boston, MA, Jeremy P. Robinson, Steven B. Singer, Bernstein, Litowitz, Berger & Grossman LLP, New York, NY, for Plaintiffs.

Frances S. Cohen, Sarah G. Kim, Ralph C. Martin II, Siobhan E. Mee, Michael C. Moran, Louis A. Rodriques, Bingham

**MEMORANDUM AND ORDER**

**RE: MOTIONS TO AMEND, DISMISS, AND TRANSFER**

GERTNER, District Judge.

TABLE OF CONTENTS

I.  *INTRODUCTION* ................................................. 207

II.  *BACKGROUND* ................................................. 210
    A.  *Procedural Posture* ....................................... 210
    B.  *Venue* .................................................. 211
        1.  *Title VII (Johnson and Finlayson)* ................... 211
        2.  *Motion to Transfer (All Claims)* ..................... 217
    C.  *The State Law Claims: Exhaustion and Scope of Coverage* ..... 218
    D.  *The Revised Second Amended Complaint* ..................... 219

III.  *CONCLUSION* ................................................. 220

## I.  INTRODUCTION

In this putative class action suit, plaintiffs, all employees or former employees of Banc of America Investment Services, Inc. ("BAI"), and Bank of America, N.A. ("BOA"), allege that BAI and BOA systematically discriminate against African-American employees, in particular Financial Advisors ("FAs") and Premier Bankers ("PBs"), on the basis of race in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Count I), Mass. Gen. Laws ch. 151B (Count II), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Count III).

The named plaintiffs are all African-Americans who are current or former PBs or FAs. Four—Turnley (FA), Finlayson (FA), Hinds (PB), and Brown (FA)—worked at defendants' office in Atlanta, Georgia;[1] two, plaintiff Rahman (FA) and putative plaintiff Hobbs (PB) both worked in Boston, Massachusetts;[2] plaintiff John-

---

1.  Brown also worked for a time in Fort Lauderdale and West Palm Beach, Florida.

2.  Plaintiffs initial complaint, filed in May of 2007, included only five plaintiffs, and alleged violations of § 1981 and Mass. Gen. Laws ch. 151B. The First Amended Complaint, filed in

November of 2007, added the Boston-based Rahman as a party, and a Title VII claim by Johnson. The proposed Second Amended complaint (document # 93), filed in April of 2008 sought to join another Boston party, Rahmel Hobbs; to add a claim for violation of Title VII on behalf of Finlayson; and to

son (FA) worked for BAI out of the office in St. Louis, Missouri; and putative plaintiff Gravely (PB) worked for the defendants in Los Angeles.

Defendants' various motions principally focus on venue. They move for transfer of the entire action to the Northern District of Georgia (Atlanta Division) under 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses (document # 65). In the alternative, defendants seek to carve the case up into its geographic components based on where the plaintiffs worked, and transfer each portion to the respective areas—Johnson's to Missouri (document # 59), the claims of Turnley, Finlayson, Hinds and Brown to Georgia (document # 65).[3]

Plaintiffs have argued that venue is proper under 28 U.S.C. § 1404(a), and to buttress that argument, have sought to amend their complaint in various ways. They sought leave to file a Second Amended complaint (document # 92) and while the instant motion to amend was pending, they sought leave to revise that proposed Second Amended complaint (document # 104). They move to add an additional Boston-based plaintiff, Rahmel Hobbs, to the claim of the first plaintiff, Rahman. And, supporting their claim of a national pattern of discrimination, they would add another plaintiff, Terry M. Gravely from Los Angeles, who claims to have been affected by the identical discriminatory policies as the others.

They have also moved to add claims under Title VII, in addition to the § 1981 allegations for named plaintiff Finlayson, and add allegations that Johnson, Finlayson, and Hobbs have exhausted administrative Title VII remedies (document # 92). Finally, in plaintiffs' most recent submissions, they have added retaliation claims based on the discharge of Finlayson and the constructive discharge of Hobbs (document # 104).

Defendants challenge the Title VII claims of Finlayson and Johnson (Count III) (in addition to their broad venue attacks on the § 1981 claims). They argue that venue in Massachusetts is not proper under Title VII's special venue provision (documents # 59, dealing with Johnson, and # 65, dealing with Finlayson). Finally, defendants also seek to dismiss Count II because of failure to exhaust administrative remedies and on the grounds that Mass. Gen. Laws. ch. 151B does not extend beyond the boundaries of Massachusetts.

But while the defendants' motions are directed to a procedural issue, whether venue is appropriate in Massachusetts, they have deeper, substantive implications for this case. The parties have diametrically different views of the proper characterization of plaintiffs' complaint. Plaintiffs allege a nationwide pattern and practice of discrimination, including, *inter alia*, its practice of partnering minority Financial Advisors with minority Private Bankers and then "steering" the minority partnerships to low net-worth sales territories, territories largely comprised of African–American client pools. Defendants' Boston senior management, plaintiffs claim, is directly responsible for the discrimination because of the way they have

add exhaustion allegations on behalf of Hobbs and Finlayson. In July of 2008, plaintiffs filed a revision of the Second Amended complaint, alleging retaliatory discharge on behalf of Hobbs and constructive discharge (also retaliatory) on behalf of Finlayson and adding Gravely, a PB in California, as a plaintiff (document # 104).

**3.** Defendants oppose the addition of Gravely as a named plaintiff because of the delay that this amendment would cause as well as the difficulty of defending against a claim so far from the locale of the other claims.

chosen to allocate decisionmaking authority over account and territorial assignments. Senior management has delegated the allocation of business opportunities to the subjective preferences of local managers across the country, managers who, plaintiffs claim, have systematically disadvantaged African–American employees of the company in the kinds of accounts they have received, in the support they are given for those accounts, in their compensation, and in their rates of promotion.

Plaintiffs' complaint is both a disparate treatment and disparate impact claim. It is a disparate treatment claim patterned after *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) insofar as it alleges that various national policies were applied to African–American employees by the defendants and their delegees with intent to discriminate. It is a disparate impact claim patterned after *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), insofar as it challenges the employer's decision to use an "undisciplined system of subjective decisionmaking" to allocate assignments. *Id.* at 990–91, 108 S.Ct. 2777.

Defendants counter that there *is* no national pattern. Plaintiffs, they maintain, have merely put forward an amalgam of unrelated and independent claims that are essentially local in nature and, by implication, ill-suited for national class action treatment at all, much less one in Boston. To the defendants, the case is not a *Watson* disparate impact claim, but just a congeries of disparate treatment claims, involving nothing more than the "everyday management decisions" of local managers.

Defs.' Mem. in Supp. of Mot. to Transfer or Sever 1 (document # 66). According to the defendants, I should divide the case amongst the courts in Georgia, Missouri, and Massachusetts.

In effect, in order to make this venue decision, I am obliged to take a position on the merits of the case—a decision about how discrimination occurred in this company, to the extent that it occurred at all, by whom, and in what way—and to do so at an early stage in the litigation. More importantly, the venue decision could well have an impact on whether the plaintiffs can prove their claims at all. If I adopt the defendants' view and send the case to various judicial districts, plaintiffs will have a more difficult time getting access to national data; defendants will no doubt tout my decision as having legitimated the "local phenomenon" theory. Plaintiffs' efforts to prove that the data relating to their treatment, far from reflecting isolated phenomena, prove a national pattern. And, given the allegations, transferring this case would lead to parallel litigation in three districts, litigation raising similar claims and similar patterns with similar results.[4]

To be sure, it may well be that after discovery the defendants will prevail. But this case is in the pleading stage; the allegations in plaintiffs' complaint are sufficient to keep the action in Massachusetts, to conduct discovery, and to give them an opportunity to prove their claims.

For the reasons described below, Defendants' Motion to Dismiss is **DENIED;** I also decline to sever and transfer the case at this time. Plaintiffs' various motions for leave to amend are also **ALLOWED.**

---

4. The Judicial Panel on Multidistrict Litigation recently addressed a case that involved the obverse of the instant one. Individual cases brought in California, Illinois, and Massachusetts all raising *Watson* claims were consolidated in a single jurisdiction. *See In Re Countrywide Fin. Corp. Mgmt. Lending Practices,* MDL–1974. *See also Miller v. Countrywide Bank, N.A.,* 2008 WL 3522374 (D.Mass. July 30, 2008).

## II. BACKGROUND

Defendant BOA is a banking subsidiary of Bank of America Corporation ("Parent Corporation") and represents the surviving entity following a merger with Fleet National Bank in 2005. The Parent Corporation, headquartered in Charlotte, North Carolina, is a worldwide financial services corporation with subsidiaries operating in thirty states, including Massachusetts. Defendant BAI, a subsidiary of BOA and part of BOA's Global Wealth & Investment Management division ("GWIM"), is headquartered in Plantation, Florida, and maintains its principal place of business in Boston, Massachusetts. BAI's FAs provide financial and investment services to customers across the United States.

Indeed, plaintiffs allege that BOA and BAI engage in a vast array of racially discriminatory practices nationwide, involving hiring, promotion, compensation, territorial/work assignments, training, partnerships, workplace networks and teams, access to financial accounts and business, departing employee account assignments, distribution of business support and office resources, and application of company policies and procedures.

At the core of plaintiffs' complaint is the way in which defendants arrange partnerships between FAs and PBs and distribute business opportunities and resources. The BAI–BOA combined business model is rather straightforward: FAs, who help customers manage and preserve wealth by providing investment services, rely heavily on the PBs with whom they are paired for client referrals to develop their business and expand their portfolio of managed assets. The career advancement and compensation of FAs and PBs is directly tied to the value of the assets that they manage in their respective capacities. This compensation system makes the assignment of territories (for PBs) and banking partners (for FAs) crucial.

Plaintiffs allege that BAI and BOA engage in a national pattern and practice of partnering minority FAs with minority PBs,[5] then assigning these minority partnerships to low net-worth sales territories, and thereby limiting their access to greater income producing opportunities. Moreover, plaintiffs allege that BOA and BAI do not adequately support African–American employees. As a result, plaintiffs assert, African–American FAs and PBs face greater difficulty than their white counterparts in developing their business, careers, and income potential.

Plaintiffs claim that when they complained about these patterns and practices, they were told that "BAI and BOA believe that BAI and BOA clients are more 'comfortable' dealing with sales professionals of their own race, and that African–American client pools do not constitute a 'lucrative market,' and are not 'sophisticated,' 'competent,' or 'savvy,' and therefore are not appropriate for the full range of BAI and BOA products and services." Compl. ¶ 2.

## III. DISCUSSION

### A. Procedural Posture

In order to resolve all of the issues presently before the Court, I will address Defendants' Motion to Dismiss and Plaintiffs' Motion to Amend the Complaint together. While consent to amend pleadings is generally freely given, this Court has the discretion to deny them "if it believes that, as a matter of law, amendment would be futile." *Carlo v. Reed*

---

5. For example, Finlayson alleges that when he questioned his local managers about the partnering decision, they told him that "senior managers located in Boston had permitted them to make the partnership and territorial assignments they made." First Am. Compl. ¶ 76.

*Rolled Thread Die Co.,* 49 F.3d 790, 792 (1st Cir.1995) (quoting *Demars v. Gen. Dynamics Corp.,* 779 F.2d 95, 99 (1st Cir. 1985)). The standard for assessing the futility of the amendment is the motion to dismiss standard. *See Adorno v. Crowley Towing & Transp. Co.,* 443 F.3d 122, 126 (1st Cir.2006). Significantly, defendants have indicated that they oppose plaintiffs' motion to amend, to file a second amended complaint only insofar as it seeks to assert a Title VII claim on behalf of plaintiff Finlayson, which they claim would be futile. Defendants continue to object to Johnson's Title VII claim and to Finlayson's and Johnson's state law claims in the Second Amended Complaint.

█ In order to withstand a motion to dismiss, the complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, ——, 127 S.Ct. 1955, 1967, 167 L.Ed.2d 929 (2007). The complaint must ... set forth " 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.' " *Podiatrist Ass'n v. La Cruz Azul De P.R., Inc.,* 332 F.3d 6, 19 (1st Cir.2003) (quoting *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 (1st Cir.1988)) (internal quotation marks omitted).

### B. *Venue*

There is no dispute that venue is proper in the District of Massachusetts for plaintiffs' § 1981 claim. Venue over this claim is governed by 28 U.S.C. § 1391, which provides that venue is proper in any judicial district in which a defendant resides. *See* 28 U.S.C. § 1391(b). The fact that BAI has its principal place of business in

Massachusetts qualifies under § 1391(b). Rather, defendants' challenge is directed to the venue of Johnson's and Finlayson's Title VII claims, under Title VII's special venue provision, 42 U.S.C. § 2000e–5(f)(3); they call for dismissal of those claims under Fed.R.Civ.P. 12(b)(3).

Defendants also challenge the venue of the entire action in Massachusetts under 28 U.S.C. § 1404(a), arguing that the convenience of parties and witnesses militate in favor of a transfer to Atlanta, or at the very least, a severance of the claims relating to the local districts. I address the Title VII issues first and then the issues under § 1404(a).

### 1. *Title VII (Johnson and Finlayson)*

█ Defendants move to dismiss the claims of Johnson and Finlayson under Title VII's special venue provision, 42 U.S.C. § 2000e–5(f)(3), and Fed.R.Civ.P. 12(b)(3). In ruling on a motion filed under Rule 12(b)(3), "[a]ll well-pleaded allegations in the complaint bearing on the venue question generally are taken as true, unless contradicted by the defendant's affidavits. A district court may examine facts outside the complaint to determine whether its venue is proper." 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1352 (3d ed.2004) (footnotes omitted). "When an objection to venue has been raised, the burden is on the plaintiff to establish that venue is proper in the judicial district in which the action has been brought." [6] *Transamerica Corp. v. Trans–American Leasing Corp.,* 670 F.Supp. 1089, 1090 (D.Mass.1987); *see*

---

**6.** There appears to be some confusion among courts as to which party carries the burden of proof when an objection to venue has been raised. *Compare Tex. Marine & Brokerage, Inc. v. Euton,* 120 F.Supp.2d 611, 612 (E.D.Tex.2000) (burden lies with defendant), *with Beckley v. Auto Profit Masters, L.L.C.,* 266

F.Supp.2d 1001, 1003 (S.D.Iowa 2003) (burden with plaintiff). The better view is that, once an objection has been raised, the burden is on the plaintiff to establish that the chosen district is proper. *See* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1352 (3d ed.2004).

*also Freeman v. Fallin,* 254 F.Supp.2d 52, 56 (D.D.C.2003).

■ Under § 2000e–5(f)(3), a Title VII action

may be brought [1] in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, [2] in the judicial district in which the employment records relevant to such practice are maintained and administered, or [3] in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office.

Only one of Title VII's venue provisions need to be satisfied in order for venue to be proper. *See Darby v. U.S. Dep't of Energy,* 231 F.Supp.2d 274, 277 (D.D.C. 2002).

■ Although the Title VII plaintiffs bring their claims on behalf of themselves and others similarly situated, "[t]he law is clear that in determining whether venue for a putative class action is proper, courts are to look only at the allegations pertain-

ing to the named representatives" who bring the Title VII claims. *Cook v. UBS Fin. Servs., Inc.,* No. 05 Civ 8842(SHS), 2006 WL 760284, at *6 n. 2 (S.D.N.Y. Mar. 21, 2006). Moreover, each individual named plaintiff must satisfy the venue provision. *See Quarles v. Gen. Inv. & Dev. Co.,* 260 F.Supp.2d 1, 13 (D.D.C.2003); *Dukes v. Wal–Mart Stores, Inc.,* No. C01–2252 MJJ, 2001 WL 1902806, at *2 (N.D.Cal. Dec.3, 2001).

Plaintiffs argue that both the first and second tests of the special venue provision are met. The stronger of the two arguments, and the one that the Court will address first, is that the allegedly unlawful employment practices *were committed* in Boston by senior management. Determining whether Massachusetts constitutes a "State in which the unlawful employment practice is alleged to have been committed" turns, in part, on whether the evidence submitted by defendants defeats plaintiffs' framing of the case in the complaint.[7] The Court finds that it does not—at least at this stage.

■ The parties' divergent framing of the issues to some extent reflects the different theories of discrimination underly-

---

7. Certain allegations contained in Plaintiffs' First Amended Complaint bear repeating here at some length:

> BAI's and BOA's nationwide account allocation policies and practices discriminate against African–Americans because they permit excessive subjectivity by management in account assignment and the allocation of business opportunities. This is a uniform practice across BAI's and BOA's offices. Thus, managers distribute accounts, referrals, leads, call-ins, walk-ins, and other business opportunities to the FAs and PBs based on management's biased personal preferences.
>
> By entrusting these managers, virtually all of whom are Caucasian, with undue discretion in these matters, BAI and BOA maintain a system whereby managers apply their own personal preferences and biases in

making allocation decisions in a way that systematically disadvantages African–Americans and limits their compensation.

The aforementioned pattern of unequal territorial and partnership assignments, support, resources, compensation, and advancement opportunities is not the result of random or non-discriminatory factors. Rather, it is the result of an on-going and continuous pattern of intentional racial discrimination in assignments, support, resources, compensation, and promotions, and reliance on policies and practices that have an adverse impact on African–American employees that cannot be justified by business necessity, and for which alternative policies and practices with less discriminatory impact could be utilized that equally serve any asserted justification....

Am. Compl. ¶¶ 40–42 (document # 56).

ing plaintiffs' allegations. Defendants' position reflects a straightforward theory of disparate treatment, albeit one focused on the subjective decisions of local managers. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiffs, however, present a more sophisticated theory, alleging that their injury derives from the allocation of decisionmaking authority, with discriminatory effects, a disparate impact theory, as well as the exercise of that authority with intent to discriminate, a disparate treatment theory, by national decisionmakers as well as local managers. *See* Am. Compl. ¶ 5 (document # 56); *see also Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 990–91, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *Bradley v. City of Lynn,* 443 F.Supp.2d 145, 155 (D.Mass.2006). Under either theory, the challenged acts—the decision to allocate authority in a discriminatory way, with or without discriminatory intent, took place in Massachusetts.

With respect to the disparate impact approach, the Supreme Court's reasoning in *Watson* is instructive. In holding that subjective decisionmaking may serve as the basis for a disparate impact claim, the Court wrote:

> If an employer's undisciplined system of subjective decisionmaking has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply. *In both circumstances, the employer's practices may be said to 'adversely affect [an individual's] status as an employee,* because of

such individual's race, color, religion, sex, or national origin.'

487 U.S. at 990–91, 108 S.Ct. 2777 (emphasis added)(alteration in original) (quoting 42 U.S.C. § 2000e–2(a)(2)); *see also* 42 U.S.C. § 2000e–2(k)(1)(A) (statutory requirements for disparate impact claims).[8] The logical implication of this passage, of course, is that the relevant practice is "committed" where the "undisciplined system of subjective decisionmaking" is initiated. Thus, for purposes of Title VII's special venue provision, the inquiry focuses first on whether the plaintiff has adequately pled the existence of such a practice in the first instance, and second, on whether the defendant's challenge undermines the facts alleged in support of plaintiff's choice of venue.

Guided by this general framework, the Court now turns to the specific facts of this case. Plaintiff Johnson, a resident of St. Louis, Missouri, worked for BAI in St. Louis as an FA from February 2006 until March 2007. Johnson does not allege that he ever worked or resided in Massachusetts, or that he sought but was refused employment in the Commonwealth. Similar to the other plaintiffs, Johnson alleges that during his time as a BAI employee he was exclusively assigned to "territories in the St. Louis market that are primarily African–America and low net-worth" and given less desirable partnering assignments. Am. Compl. ¶¶ 105–09 (document # 56). He also alleges that when senior FAs left the St. Louis branch, the largest and most profitable accounts were assigned to white FAs, and that he received an unfair decrease in pay.

---

**8.** The Court added:

> We are also persuaded that disparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests. In either case, a facially neutral practice, adopted

without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices.

*See Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 990, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

Defendants assert that each of the factual allegations relating to Johnson's Title VII claim relates to decisions made by Thomas Schwarz, Senior Vice President and Market Director for Missouri, in conjunction the St. Louis area Market Manager, Melissa Wilson. Schwarz Dec. 1 (document # 62). In his declaration, Schwarz states that he served as Johnson's immediate supervisor for the entire period of Johnson's employment. *Id.* Schwarz states that he and other local managers in Missouri were responsible for making all of the decisions regarding the territorial assignments of FAs in Missouri, decisions to establish and to terminate partnerships, and decisions regarding account assignments. At no time did he ever report to a supervisor in Massachusetts; nor did his decisions require approval of any manager in Massachusetts.[9] *Id.* at 2.

The Schwarz declaration suggests that the particular decisions relating to Johnson's partnering and territorial assignments and compensation were made at the local level in St. Louis. However, these decisions do not comprise the entire universe of decisions relevant to Johnson's allegations. As noted above, Johnson alleges that he was also injured as a consequence of defendants' decision to allocate decisionmaking authority to local managers without objective rules or standards. *That* decision, as framed by plaintiffs and informed by the Supreme Court's opinion in *Watson,* is alleged to have been made by defendants' senior management in Boston.

Viewed this way, the Schwarz declaration does nothing to vitiate Johnson's choice of venue based on his disparate impact claim. In fact, it does just the opposite: the declarations and affidavits submitted by defendants tend to suggest that local and regional managers operate with virtually no oversight from Boston-based senior level management in making the front-line decisions at issue in this case.

It is undisputed by defendants that senior level managers and executives—such as Brian Moynihan, Patrick Phillips, John Bahnken, Keith Banks, Jeff Carney, Richard Kane, and Jane Magpiong—are located in this judicial district.[10] *See* Exh. E to Singer Dec. (document # 30–5); *see also Pierce v. Shorty Small's of Branson, Inc.,* 137 F.3d 1190, 1192 (10th Cir.1998) (plaintiff is entitled to rely upon the well-pled facts of her complaint, but "only to the extent that such facts are uncontroverted by defendant's affidavit").

Moreover, while the Court must determine whether venue is proper, assessing the facts alleged in the complaint and submitted by the parties solely as they relate to Johnson, the Court ought not ignore the specific allegations of the other plaintiffs. Indeed, the fact that several former and current BOA and BAI employees in different offices allege to have experienced the

---

**9.** Schwarz further states that Johnson's personnel files are maintained in his office in St. Louis and that to the best of his knowledge, neither BAI nor BOA maintain centralized records of partnership assignments. Schwarz Dec. 3 (document # 62). Defendants have also submitted a declaration from Robert M. Drozynski, a BOA Vice President, who states that defendants' payroll, personnel, and human resources functions have been outsourced to a third-party vendor, Fidelity, which maintains centralized records in Kentucky. Drozynski Dec. 1–2 (document # 63).

**10.** According to defendants' own press release: "[Patrick] Phillips will lead the delivery of comprehensive financial services to affluent clients across the United States through the company's Premier Banking and Banc of America Investment Services, Inc. (BAI) organizations. Phillips will report to Brian Moynihan, president of Global Wealth & Investment Management and will be based in Boston." Exh. F to Singer Dec. (document # 30–6).

very same practices at the local level suggests that the similarities in their experience are not a matter of mere coincidence.[11] A reasonable inferences from these facts is that there exists a nationwide practice "committed" at the highest levels of management, the effects of which are experienced in different parts of the country.[12] That practice—allocating decisionmaking authority to local managers—if "committed" with the intent to discriminate could meet the *McDonnell–Douglas* test. If "committed" without the intent to discriminate but with discriminatory effects, it could satisfy a *Watson* claim. Either way, venue would be appropriate here. *Cf. Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir.2000) (Title VII venue proper "in both the forum where the employment decision is made and the forum in which that decision is implemented or its effects are felt"); *see also Berry v. Potter*, No. CIV 04–2922, 2006 WL 335841, at *3 (D. Ariz. Feb 10, 2006) (venue proper where adverse decision was made *and* where plaintiff felt the effect of the injury).

In *Hoffman v. United Telecomm., Inc.*, 575 F.Supp. 1463 (D.Kan.1983), for example, the plaintiff, acting on behalf of herself and "all females who are, were, or might be employed by defendants in managerial and professional positions," alleged that defendant holding company and thirty-eight subsidiaries located throughout the country discriminated against female employees with respect to job assignments, training and advancement opportunities, salary, and responsibility. *Id.* at 1466. Rejecting defendants' Rule 12(b)(3) challenge, the Court found that Title VII venue was proper on the grounds that the

> practices and procedures relating to personnel and management of employees are established and implemented ... in the District of Kansas for all of the defendant subsidiaries. Plaintiff's complaint alleges that the parent company ... and its subsidiaries have engaged in system-wide discrimination based on sex, and have thereby harmed her and other women similarly situated. *The court finds the alleged unlawful employment practice to have taken place in the district of Kansas due to the control exercised by the parent corporation ... in regard to its development and enforcement of its personnel policies and practices.*

*Id.* at 1484 (emphasis added).

In contrast, in 2006, a district court in *Cook* declined to follow *Hoffman*, for reasons that are wholly distinguishable in the case at bar. 2006 WL 760284, at *4. In that case, plaintiffs apparently focused on a single decision, the decision to open a branch office in Largo, Maryland, staffed exclusively by African–Americans, referred to derisively as the "diversity" office, and not supported with adequate resources. That decision, defendants claim,

---

11.  *Cf. Ladele v. Consol. Rail Corp.*, 95 F.R.D. 198, 203 (E.D.Pa.1982) (in class certification context, holding that "it may be reasonable to infer that the discrimination suffered by plaintiff was not isolated if: (1) there was evidence that a central administration knew of the discriminatory practices, and permitted them to continue; (2) there was statistical evidence of a consistent, system-wide pattern; or (3) similar charges were made by other employees").

12.  *Cf. Cormier v. Pezrow New England, Inc.*, 437 Mass. 302, 306, 771 N.E.2d 158 (2002)

("We do not read [ch. 151B] so narrowly as to mean that conduct constituting an unlawful termination can occur only in one place, and, consequently, that there is only one venue in which an employment discrimination claim may be brought.... An unlawful employment practice may consist of many actions and decisions made far from where the employee is physically located, between company officials who themselves are separated by great distances, and may be implemented in one of many jurisdictions.")

was not made by national staff in New York. Plaintiffs countered by arguing that defendant's policies and procedures for its branch offices were developed in, or in collaboration with, the company's New York headquarters and that all policies ultimately had to be approved by senior management in the New York office. *Id.* at *3. The court found venue to be improper, because of the vagueness of plaintiffs' allegations: "At most [plaintiffs' submissions] establish that broad-based personnel policies had to be approved by [defendant's] Manhattan headquarters. It does not necessarily follow, however, that any of the specific personnel decisions affecting [plaintiff] or the [Maryland] office were made in New York." *Id.* at *4 (citing *Robinson v. Potter*, 2005 WL 1151429, at *4 (D.D.C. May 16, 2005) ("Mere speculation of principal office involvement does not counter the fact that in the plaintiff's complaint, the acts committed occurred [in a different district].")). Significantly, the Court in *Cook* did not reject the reasoning in *Hoffman*, but instead distinguished it on the grounds that the plaintiffs in *Cook* had not made any "specific allegation that any of the employment practices complained of

resulted from decisions made in" the company's corporate headquarters. *Id.* at *4. And they apparently made no claim under *Watson.*

In the instant case, plaintiffs have made such specific allegations. The core discriminatory practice alleged—namely, the granting of unfettered decisionmaking authority to regional and local managers in matters of territorial assignments, partnering, etc. with or without discriminatory intent—was committed in Massachusetts.[13] *Cf. Tamashiro v. Harvey*, 487 F.Supp.2d 1162, 1166 (D.Haw.2006) (holding that in failure-to-promote discrimination controversies the discriminatory actors need not only be in the same location as the employee). The national pattern reflected in similar complaints by the Georgia, Missouri, and Massachusetts plaintiffs key that practice to a national policy. Venue is proper in Massachusetts.[14]

■ Because the same analysis applies equally to Finlayson, the Court need not go into great detail in determining whether the addition of his Title VII claim would be futile. As with Johnson, defendants have produced convincing evidence that

13. To be sure, as defendants suggest, "all corporate decisions ultimately are the result of high-level policy decisions made by senior management and can in some sense be attributed to senior management." Defs.' Mem. in Supp. of Mot. to Dismiss 8 (document # 61). Thus, the Court must be careful not to allow plaintiffs to undermine Congress' intent in drafting Title VII's special venue provision. *See Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir.1993) ("[T]he judicial district where the employer's principal office is located is a proper place for venue only if venue cannot be laid in one of the other three possible districts specified in the statute."); *Robinson v. Potter*, No. Civ. A 04–0890(RMU), 2005 WL 1151429, at *4 (D.D.C. May 16, 2005) ("If the court were to interpret actions or omissions of an administrative agency as decisions determined at the agency's headquarters then a plaintiff would always be able to establish venue wherever the principal office is located.

Even a cursory review of 42 U.S.C. § 2000e–5(f)(3) reveals that Congress did not intend this...."). To say that plaintiffs may not sue defendants in their principal places of business by merely alleging a general hierarchical structure, however, does not mean that plaintiffs are constrained to sue only in the states where they and their immediate managers are located. Where, as here, the plaintiffs have sufficiently pled a disparate impact claim in the mold of *Watson*, at the very least, venue properly lies in the district where those with the decisionmaking authority to change the relevant practice are located.

14. Because the first prong of Title VII's venue provision is satisfied, there is no need to address the question of whether "the employment records relevant to such practice are maintained and administered" here. *See* § 2000e–5 (f)(3).

the particular decisions relating to Finlayson's partnering and territorial assignments and compensation were made either at the local level in Atlanta or in conjunction with regional supervisors located in Florida. *See, e.g.,* Carrington Dec. (document #67); Thigpen Dec. (document #70); Walker Dec. (document #72). Nonetheless, Finlayson, like Johnson, also alleges a disparate impact claim. And because the relevant practice at issue in the disparate impact claim took place in this judicial district, the addition of Finlayson's Title VII claim would not be futile.

Disallowing Johnson's and Finlayson's claims to proceed in this district would make little practical sense and could lead to an unnecessary multiplicity of litigation in at least three judicial districts. *See Gilbert v. Gen. Elec. Co.,* 347 F.Supp. 1058, 1060 (E.D.Va.1972) ("[Class actions,] which are particularly appropriate and plentiful under Title VII, are often of interstate or intrastate character, stretching in geographical impact beyond the limits of particular divisions or state districts. In this light, determination of venue merely upon the named litigants would have an arbitrary effect."). While the factual bases underlying the respective plaintiffs' disparate treatment allegations necessarily differ, it seems clear that the disparate impact claim—which will undoubtedly involve the analysis of large swaths of data relating to defendants' business practices—is identical as to all of the named plaintiffs.

Indeed, the Title VII's venue provision provides a mechanism seemingly designed to avoid such a multiplicity of litigation, whereby defendants sued in diverse fora simultaneously are able to move to transfer and consolidate the cases in the judicial district where their principal place of business is located. *See* 42 U.S.C. § 2000e–5(f)(3) ("For purposes of sections 1404 and 1406 of Title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought.").

### 2. *Motion to Transfer (All Claims)*

Next, defendants move pursuant to 28 U.S.C. § 1404(a) to transfer this case to the Northern District of Georgia (Atlanta Division), or, in the alternative, to sever and transfer the claims of plaintiffs Turnley, Finlayson, Hinds, and Brown (the Atlanta-based plaintiffs). In light of the Court's analysis in the preceding section and for the reasons that follow, defendants' motion is denied at this time.

Under § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The decision to transfer a case pursuant to § 1404 rests within the sound discretion of the trial court. *Codex Corp. v. Milgo Elec. Corp.,* 553 F.2d 735, 737 (1st Cir.1977). "A presumption in favor of the plaintiff's choice exists, and the burden of proving that a transfer is warranted rests with the defendant." *Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.,* 56 F.Supp.2d 134, 141 (D.Mass.1999). Bearing in mind that the plaintiffs' choice of forum is entitled to great weight—and arguably even greater weight than usual in the Title VII context, *see Ellis v. Costco Wholesale Corp.,* 372 F.Supp.2d 530, 537 (N.D.Cal.2005)—the Court must consider several factors, including the convenience of the parties and witnesses, the availability of documents, and the interests of justice, *Fairview,* 56 F.Supp.2d at 141. "Of those factors, the convenience to the expected witnesses is 'probably the most important factor, and the factor most frequently mentioned.'" *Id.* (quoting *Princess House, Inc. v. Lindsey,* 136 F.R.D. 16, 18 (D.Mass.1991)).

Given the case's current procedural posture and the Court's determination that Title VII venue is proper in this district, the Court will not go into great detail regarding the underlying facts pertaining to the motion to transfer. Of the seven named plaintiffs in the proposed second amended complaint, three were employed exclusively in Georgia; one worked in both Georgia and Florida; one worked in Missouri; and two were employed in Massachusetts. From defendants' submissions, it seems fairly clear that many witnesses and documents relevant to plaintiffs' individual disparate treatment claims are located in their respective places of employment. See Huvelle Dec. 1–7 (document # 69); Drozynski Dec. 1–2 (document # 63). But documents seeking to relate those claims to the national pattern—the *Watson*-type policy, for example—are in Massachusetts.

In any event, it is unclear which aspects of plaintiffs' claims, if any, will go forward as class claims and which will proceed individually. Thus, in the interests of judicial efficiency, it makes sense to deny defendants' motion at this time, but to revisit the issue once the matter of class certification has been resolved.

## C. *The State Law Claims: Exhaustion and Scope of Coverage*

Defendants argue that Count II, plaintiffs' state law claim, must be dismissed as to plaintiffs Finlayson and Johnson 1) for failure to exhaust administrative remedies prior to initiating court action and 2) because the protections of Mass. Gen. Laws ch. 151B do not apply "extraterritorially" to employees who work and reside outside of Massachusetts. The Court disagrees.

Chapter 151B requires plaintiffs to file charges of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") prior to initiating court action: "Any person claiming to be

aggrieved by a practice made unlawful under this chapter ... may, at the expiration of ninety days after the filing of a complaint with [MCAD], or sooner if a commissioner assents in writing ... bring a civil action for damages or injunctive relief or both...." Mass. Gen. Laws ch. 151B, § 9. Accordingly,

> [a] plaintiff 'may maintain a civil action only if he has previously filed a timely complaint with the MCAD and ninety days have passed (or a commissioner has assented in writing to an earlier filing).' A plaintiff may not otherwise resort to the courts for a discrimination claim that is within the jurisdiction of MCAD unless he has followed these procedures.

*Reidy v. Travelers Ins. Co.*, 928 F.Supp. 98, 106–07 (D.Mass.1996) (quoting *Christo v. Edward G. Boyle Ins. Agency, Inc.*, 402 Mass. 815, 816, 525 N.E.2d 643 (1988)).

None of the plaintiffs named in the currently operative first amended complaint filed charges of discrimination with MCAD prior to the filing of the original complaint. The original complaint in this suit, which named both Finlayson and Johnson as plaintiffs, was filed on May 18, 2007. According to the first amended complaint, Finlayson and Johnson did not submit Charges of Discrimination to the Boston Area Office of the EEOC—with copies to MCAD for dual filing—until June 21, 2007. The EEOC issued Johnson's Right to Sue Letter on November 5, 2007. Finlayson's letter was not issued until March 19, 2008, after the first amended complaint had already been filed. Plaintiffs filed their first amended complaint on November 29, 2007—more than ninety days after Johnson and Finlayson dual-filed their complaints with the EEOC and MCAD. Plaintiffs moved to amend their complaint for a second time on April 7, 2008, after there had been exhaustion.

I find that Johnson and Finlayson have satisfied chapter 151B's exhaustion requirement. The currently operative first amended complaint was filed well after the ninety-day exhaustion period had elapsed. Thus, any deficiency in the original complaint was cured by the filing of the amended complaint. The legislative intent motivating the administrative exhaustion requirement was to "subject all discrimination claims to some administrative scrutiny," prior to any judicial action.[15] *Charland v. Muzi Motors, Inc.*, 417 Mass. 580, 585, 631 N.E.2d 555 (1994). Once the administrative process has been allowed to run its course, however, and the state's policy concerns have been satisfied, there is no bar to this Court's exercise of its jurisdiction. *Cf. Lebron–Rios v. U.S. Marshal Serv.*, 341 F.3d 7, 13 (1st Cir.2003) (concluding that "dismissal of plaintiffs' Title VII claims should have been without prejudice to any civil action filed after exhaustion of administrative remedies"). Thus, Johnson and Finlayson have properly pleaded exhaustion of their administrative remedies.

Putative plaintiff Hobbs likewise has satisfied chapter 151B's exhaustion requirement. According to the proposed second amended complaint, Hobbs dual-filed his Charge of Discrimination with the EEOC and MCAD on February 26, 2008. The EEOC issued a Right to Sue Letter on February 28, 2008, and on March 19, 2008, MCAD consented in writing to Hobbs withdrawing his charge. It was not until April 7, 2008, that plaintiffs moved to amend the complaint and add Hobbs as a party. Thus, because Hobbs, who works and lives in Boston, did not attempt to bring suit in this Court until after following the proper statutory procedures, the

motion to amend the complaint is allowed as to his chapter 151B claim.

The Court also rejects defendants' argument that Johnson and Finlayson's state law claims on their face represent improper "extraterritorial" extensions of chapter 151B's protections. The extent to which defendants' allegedly discriminatory conduct took place in Massachusetts is described above, in the section pertaining to defendants' venue challenge. Nonetheless, the Court notes here that courts are required to "liberally construe [the provisions of 151B] for the purposes thereof." Mass. Gen. Laws ch. 151B, § 9. As such, courts have applied 151B in situations where the employment decisions at issue were made in Massachusetts, though their effects were felt in another state. *See Cormier v. Pezrow New Eng.*, 437 Mass. 302, 306, 771 N.E.2d 158 (2002). MCAD has itself followed this interpretation, finding that it "has a significant interest in encouraging in-state Respondents to promote work environments free of discrimination." *Everett v. InterQual, Inc.*, Docket No. 98–132813 (MCAD 1999) (Exh. 1 to Messing Dec. (document #31–2)) (151B applied to decision made by Massachusetts employer where employee worked in New Hampshire). Thus, I find that Johnson and Finlayson have properly stated claims under chapter 151B.

### D. *The Revised Second Amended Complaint*

The defendants oppose plaintiffs efforts to revise its second amended complaint to add a new plaintiff, Gravely, from Los Angeles. They charge that the "revision" is too late, that it would be unduly disruptive of the existing litigation. They

---

**15.** "The filing requirement has a dual purpose. First, it is meant to provide the agency with an opportunity to investigate and conciliate the claim of discrimination. Second, the filing requirement provides notice to the defendant of a potential suit." *Conroy v. Boston Edison Co.*, 758 F.Supp. 54, 57 (D.Mass. 1991).

also claim that defending against charges at such a distance from the site of the litigation would be onerous.

I disagree. The litigation is still at a relatively preliminary state. Moreover, if this case were to be certified as a national class action, defendants would have to defend such charges, onerous or not.

### III. CONCLUSION

In sum, Plaintiffs' Motion for Leave to File Second Amended Complaint (document # 92) and as revised (document # 104) is **GRANTED.** Defendants' Motion to Dismiss (document # 59) is **DE-NIED.** Finally, Defendants' Motion to Transfer (document # 65) is **DENIED,** with the proviso that the Court will entertain renewed motions to transfer once issues of class certification are resolved.

**SO ORDERED.**